

IN THE UNITED STATES DISTRICT COURT 2011 JUN 28  PM 1: 46
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION

CLERK
SO. DIST. OF GA.

|  |  |
|---|---|
| UNITED STATES, ex rel. PHILLIP S. SCHAENGOLD,<br><br>Plaintiff · Relator<br><br>v.<br><br>The Tattnall Hospital Company, LLC<br>210 East DeRenne Avenue<br>Savannah, Georgia 31405<br><br>The Doctors Hospital of Tattnall<br>247 South Main St.<br>Reidsville, Georgia 30453<br><br>Orthopedic Center, P.C.<br>The Orthopedic Surgery Center, L.P.<br>210 East DeRenne Ave<br>Savannah, GA 31405<br><br>Michael Kleinpeter<br>210 DeRenne Avenue,<br>Savannah, Georgia 31405<br><br>John P. George, Jr., M.D.<br>210 East DeRenne Avenue<br>Savannah, Georgia 31405<br><br>Michael Scribner<br>413 W. Montgomery Cross Rd.,<br>Suite 602,<br>Savannah, Georgia 31406<br><br>Defendants. | **CV411  166**<br><br>Civil Action No. _____<br><br>FILED *IN CAMERA* AND<br>UNDER SEAL PURSUANT<br>TO 31 U.S.C. § 3730(b)(2) |

## FALSE CLAIMS ACT / QUI TAM COMPLAINT

1.       This is a *qui tam* complaint brought by Plaintiff-Relator Phillip S. Schaengold on behalf of the United States of America to recover damages and civil penalties arising from the Defendants' actions in violating the False Claims Act, 31 U.S.C. § 3729, *et seq.*  Defendants knowingly presented, or caused to be presented, numerous false or fraudulent claims for payment or approval to the United States in connection with the operation of their health care facilities in Reidsville, Georgia and Savannah, Georgia.  These false claims were the product of the Defendants' conspiracy to inflate the charges at Doctors Hospital of Tattnall substantially in excess in the costs associated with patient care, which resulted in improper Medicare and Medicaid payments.  In addition, physicians were paid unlawful kickbacks and excessive compensation in return for referring Medicare, Medicaid and TRICARE/CHAMPUS patients for medical services at Defendant facilities.  In support of the Complaint, Relator avers as follows:

## JURISDICTION AND VENUE

2.       This Court has jurisdiction over this action under 28 U.S.C. § 1331 in that the claims arise under the laws of the United States, specifically the False Claims Act, 31 U.S.C. § 3729-33, the Federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, and the Stark Act, 42 U.S.C. § 1395nn.  In addition, the Court has jurisdiction over this action pursuant to 28 U.S.C. § 1345 because the United States is a party to the action.

3.       Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391(b) because the Defendants reside in this District and because a

- 2 -

substantial part of the events or omissions giving rise to the claims occurred in this District.

## PARTIES

4.      Relator Phillip S. Schaengold is a resident of the State of Georgia. Relator served as President and Chief Executive Officer of Memorial Health, Inc. and Memorial Health University Medical Center, Inc. from June 1, 2009 until January 5, 2011.  Relator has personal and independent knowledge of the false records, statements and/or claims presented to the Government by and for the defendants named herein and of defendants' fraudulent cost reporting activities.

5.      Defendant The Tattnall Hospital Company, LLC is a Limited Liability Corporation organized under the laws of the State of Georgia and maintains a principal office address of 210 East DeRenne Avenue, Savannah, Georgia 31405

6.      Defendant The Doctors Hospital of Tattnall is designated as a Critical Access Hospital organized under the laws of the State of Georgia and maintains a principal office address of 247 South Main St., Reidsville, Georgia 30453.

7.      Defendant Orthopedic Center, P.C. is a professional corporation organized under the laws of the State of Georgia and maintains a principal office address of 210 East DeRenne Avenue, Savannah, Georgia 31405.  Orthopedic Center, P.C. does business as Southeastern Orthopedic Center.

8.      Defendant Orthopedic Surgery Center, L.P. is a limited partnership organized under the laws of the State of Georgia and maintains a principal office address of 210 East DeRenne Ave, Savannah, GA 31405.

9.      Defendant Michael Kleinpeter is Chief Executive Officer and Registered Agent of Orthopedic Center, P.C. and the Registered Agent of Tattnall Hospital Company, LLC and maintains a principal office address of 210 DeRenne Avenue, Savannah, Georgia 31405.

10.     Defendant John P. George, Jr., M.D. is Secretary and physician leader of Orthopedic Center, P.C. and maintains a principal office address of 210 East DeRenne Avenue, Savannah, Georgia 31405.

11.     Defendant Michael Scribner is cofounder and co-owner of Strategic Health Partners and maintains a principal office address of 413 W. Montgomery Cross Rd., Suite 602, Savannah, Georgia 31406.  Defendant provides consulting services relating to contract negotiations, managed care strategic planning, financial analysis, business office functionality, charges and access point analysis for hospitals and physician practices.

## LEGAL AND REGULATORY BACKGROUND

12.     Title XVIII of the Social Security Act, 42 U.S.C. § 1395, *et seq.*, establishes the Health Insurance for the Aged and Disabled Program, popularly known as the Medicare program. The Secretary of the United States Department of Health and Human Services ("HHS") administers the Medicare Program through the Centers for Medicare and Medicaid Services ("CMS").

13.     Medicare Part A provides basic insurance for the costs of hospitalization and post-hospitalization care.  42 U.S.C. § 1395c-1395i-2 (1992). Medicare Part B is a federally subsidized, voluntary insurance program that covers

the fee schedule amount for laboratory services. 42 U.S.C. §§ 1395(k), 1395(i), 1395(s).

14.    Reimbursement for Medicare claims is made by the United States through CMS. CMS, in turn, contracts with private insurance carriers to administer and pay Medicare Part B claims from the Medicare Trust Fund. 42 U.S.C. § 1395(u). In this capacity, the carriers act on behalf of CMS. 42 C.F.R. § 421.5(b). Most hospitals, including Defendants, derive a substantial portion of their revenue from the Medicare program.

15.    In order to receive Medicare funds, enrolled suppliers, including Defendants, together with their authorized agents, employees, and contractors, are required to abide by all the provisions of the Social Security Act, the regulations promulgated under the Act, and all applicable policies and procedures issued by the states.

16.    Among the rules and regulations which enrolled suppliers, including Defendants, agree to follow are to: (a) bill Medicare Carriers for only those covered services which are medically necessary; (b) not bill Medicare Carriers for any services or items which were not performed or delivered in accordance with all applicable policies, nor submit false or inaccurate information relating to provider costs or services; (c) not engage in any act or omission that constitutes or results in over-utilization of services; (d) be fully licensed and/or certified under the applicable state and federal laws to perform the services provided to recipients; (e) comply with state and federal statutes, policies and regulations applicable to the

Medicare Program; and (f) not engage in any illegal activities related to the furnishing of services to recipients.

17.     Under the Medicare Program, CMS makes payments retrospectively (after they are rendered) to hospitals for inpatient services. In order to establish a hospital's eligibility to participate in the program, Medicare enters into provider agreements with a given hospital.

18.     To assist with the administration of Medicare Part A, CMS contracts with fiscal intermediaries ("FIs") pursuant to 42 U.S.C. § 1395h. These FIs are typically insurance companies, and are responsible for processing and paying claims and for audits of a provider's cost reports. Upon discharging a Medicare beneficiary, the hospital submits claims for interim reimbursement for items and services provided during the beneficiary's stay. 42 C.F.R. §§ 413.1, 413.60, 413.64. Hospitals use CMS Form UB-92 (formerly HCFA Form UB-82) to submit these interim claims.

19.     In order to receive payment from Medicare, CMS requires hospitals to annually submit CMS-2552, known as a Hospital Cost Report. Cost Reports are the final claim made to a FI for payment for services provided to Medicare beneficiaries.

20.     The Cost Report, which is filed with the FI, states the total amount that the hospital believes it is due for the year from CMS. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). CMS relies on the Cost Report to determine whether it owes the hospital more than has been paid

- 6 -

through interim payments, or whether the hospital has been overpaid and must reimburse the Medicare program. 42 C.F.R. §§ 405.1803, 413.60, and 413.64(f)(1).

21.     Medicare payments for inpatient hospital services are determined by the claims submitted by the provider for particular patient discharges (specifically listed on UB-92s/UB-82's) during the course of the fiscal year. On the Cost Report, this liability for inpatient services is then totaled with any other Medicare liabilities owed to the provider. This total determines Medicare's true liability for services rendered to Medicare beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare program or the amount due the provider.

22.     For the years 2009 and 2010, Defendants submitted Hospital Cost Reports that falsely represented compliance with Medicare laws/regulations. These misrepresentations were material to the Government's decision to pay for services. In light of the foregoing, each CMS Form UB-92/UB-82 submitted by Defendants under Medicare was a false claim.

23.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to Medicare patients. Physicians and physician groups submit form CMS-1500 (formerly HCFA-1500) for this purpose. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

- 7 -

24.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in the Medicare program, and that they have complied with all applicable regulations and laws governing the program.

25.     At all times relevant to this complaint, Defendants were enrolled in, and sought reimbursement from, the Civilian Health and Medical Program of the Uniformed Services (CHAMPUS), now known as TRICARE Management Activity/CHAMPUS ("TRICARE/CHAMPUS"). TRICARE/CHAMPUS is a federally-funded program that provides medical benefits, including hospital services to (a) the spouses and unmarried children of (1) active duty and retired service members, and (2) reservists who were ordered to active duty for thirty days or longer (b) the unmarried spouses and children of deceased service members; and (c) retirees. Hospital services at non-military facilities are sometimes provided for active duty members of the armed forces as well. 10 U.S.C. § 1971-1104; 32 C.F.R. § 199.4(a).

26.     In addition to individual patient costs, providers are required to submit a TRICARE/CHAMPUS form, "Requests for reimbursement of CHAMPUS Capital and Direct Medical Education Costs," ("Requests for Reimbursement") in which the provider sets forth its number of TRICARE/CHAMPUS patient days and financial information which relates to these two cost areas and which is derived from the facility's Medicare cost report. This Request for Reimbursement requires that the provider expressly certify that the information contained therein is "accurate and based upon the hospital's Medicare cost report".

- 8 -

27.     Upon receipt of a hospital's Request for Reimbursement and its financial data, TRICARE/CHAMPUS or its FI applies a formula for reimbursement wherein the hospital receives a percentage of its capital and medical education costs equal to the percentage of TRICARE/CHAMPUS patients in the facility. Defendants submitted Requests for Reimbursements to TRICARE/CHAMPUS that were based on its Medicare cost reports.

28.     Whenever Defendants' Medicare cost reports contained falsely inflated or incorrect data or information from which Defendant derived their Requests for Reimbursement submitted to TRICARE/CHAMPUS, those Requests for Reimbursement were also false.

29.     Whenever Defendants' Requests for Reimbursement were false due to falsity in their Medicare cost reports, Defendants falsely certified that the information contained in their Requests for Reimbursement was "accurate and based upon the hospital's Medicare cost report" (emphasis added).

30.     In addition to the hospital fees billed by hospitals, physicians also bill for their services provided to TRICARE/CHAMPUS patients. Physicians and physician groups submit form CMS-1500 for this purpose. The CMS-1500 claim form requires the physician to certify that the physician "understand(s) that payment and satisfaction of this claim will be from Federal and State funds, and that any false claims, statements, or documents, or concealment of a material fact, may be prosecuted under applicable Federal or State laws."

31.     By submitting CMS-1500 forms, physicians and physician groups certify that they are eligible for participation in TRICARE/CHAMPUS program,

- 9 -

and that they have complied with all applicable regulations and laws governing the program, including the Anti-Kickback Statute.

32.     Medicare Rural Hospital Flexibility Program, 42 U.S.C. § 1395i-4, was enacted as part of the Balanced Budget Act (BBA) of 1997 and authorized states to establish State Medicare Rural Hospital Flexibility Programs, under which certain facilities participating in Medicare can become Critical Access Hospitals (CAH).

33.     CAHs represent a separate provider type with their own Medicare Conditions of Participation as well as a separate payment method and are not subject to the Inpatient Prospective Payment Systems or to the Hospital Outpatient Prospective Payment System.

34.     CAHs must be located in a rural area more than 35 miles from the nearest hospital or CAH; Have an average annual length of stay of 96 hours or less (excluding beds that are within a distinct unit i.e. rehabilitation or psychiatry, each with up to 10 beds); Furnish 24-hour emergency care services; and provide no more than 25 inpatient beds that can be used for either inpatients or swing bed services.

35.     Medicare pays CAHs for inpatient services to Medicare beneficiaries on the basis of reasonable cost of providing the services, as determined under applicable Medicare principles of reimbursement, except that following principles do not apply: the lesser of costs or charges rule, ceilings on hospital operating costs, and the reasonable compensation limits for physician services to providers.

36.     Medicare pays CAHs for most outpatient services to Medicare beneficiaries on the basis of reasonable cost of providing the services, as determined under applicable Medicare principles of reimbursement, except that

- 10 -

following principles do not apply: the lesser of costs or charges rule, ceilings on hospital operating costs, and the reasonable compensation limits for physician services to providers, any type of reduction to operating or capital costs, blended payment amount for ASC, radiology, or other diagnostic services, and the clinical laboratory payment methodology.

37.     The Medicare Part A and Part B deductible and coinsurance rules applicable to hospital services also apply to CAHs.  All outpatient CAH services are subject to Part B deductible and coinsurance except for a limited number of screening and vaccine services.

38.     Payment for inpatient or outpatient CAH services is not subject to the reasonable cost principles of lesser of cost or charges and reasonable compensation equivalent limits.

39.     Payment to a CAH for inpatient CAH services is not subject to ceilings on hospital inpatient operating costs or the 1-day or 3-day preadmission payment window provisions applicable to hospitals paid under the IPPS and OPPS.

40.     Under Section 1834(g)(1) of the Social Security Act (the Act), CAHs are paid under the Standard Payment Method.  For cost reporting periods beginning on or after January 1, 2004, Medicare pays CAHs one hundred and one (101) percent of their allowable costs for most inpatient services.  Medicare pay CAH for most outpatient services at the lesser of eighty (80) percent of the one hundred and one (101) percent of reasonable costs for outpatient CAH services or 101 percent of the reasonable cost less the applicable Part B deductible and coinsurance amounts.

41.     To calculate "reasonable cost," CMS's cost accounting methodology allocate costs among patients based on a combination of factors such as the number of days a patient stays in the hospital and the dollar value of charges the patient incurs for ancillary services.  The result is a Cost-to-Charge ratio that when applied to the total Medicare and Medicaid charges results in an estimated "cost" to be reimbursed by Medicare and Medicaid.

## FACTUAL BACKGROUND

42.     The claims in this case center on the Defendants' unlawful plan to inflate charges at The Doctors Hospital of Tattnall substantially in excess of any increase in the costs associated with patient care, which resulted in improper and excessive payments from Medicare and Medicaid.

43.     Once the plan was implemented, the Defendants' inflated charges resulted in an overcharging to patients because their deductible and coinsurance amounts were pushed up by the inflated charges.

44.     The excessive charges constitute false claims that are expressly prohibited by the False Claims Act.

45.     In addition, physicians were paid referral fees in the form of excessive compensation and an incentive to refer Medicare, Medicaid, and TRICARE/CHAMPUS patients to the Defendant facilities.  This compensation is prohibited by the Federal Anti-Kickback statute and the Stark Act.

46.     The Doctors Hospital of Tattnall ("The Hospital") is designated as a Critical Access Hospital (CAH) located in Reidsville, Georgia about 70 miles west of Savannah, Georgia.

47.     The Hospital's predecessor was Tattnall Memorial Hospital, a privately-owned CAH-designated hospital that was scheduled to be closed in February 2008 due to financial failure.  On information and belief, Tattnall Memorial Hospital only generated approximately $12,894,341 in total inpatient and outpatient charges in 2007 (see 2007 CMS Cost Report filed in 2008).

48.     On or about February/March 2008, Defendant, The Tattnall Hospital Company LLC, created (as an affiliate) Defendant Orthopedic Center, P.C.  This affiliate is an orthopedic practice whose principal location is in Savannah, Georgia with offices throughout southeast Georgia.  Orthopedic Center, P.C. took over the management responsibilities for Tattnall Memorial Hospital.

49.     In December 2008, Defendant, The Tattnall Hospital Company, LLC, acquired Tattnall Memorial Hospital and renamed it The Doctors Hospital of Tattnall.

50.     On information and belief, Tattnall Memorial Hospital generated $29,603,336 in charges in total inpatient and outpatient charges in 2008 (see 2008 CMS Cost Report filed in 2009).

51.     Prior to December 2008, Tattnall Memorial Hospital was a member of the Memorial Health Partners, Inc. (MHP) network of hospital providers.  MHP is a health plan that provides self-insured employers located in Savannah and

- 13 -

southeastern Georgia with a network of physicians, hospitals and outpatient services.

52.     MHP is a for-profit corporation organized under the laws of the State of Georgia.  MHP's sole corporate member is Provident Health Services, Inc. (PHS), a for-profit corporation organized under the laws of the State of Georgia.  PHS's sole corporate member is Memorial Health, Inc., a non-profit corporation organized under the laws of the State of Georgia.  Memorial Health, Inc., PHS and MHP maintain a principal office address of 4700 Waters Avenue, Savannah, Georgia 31404.

53.     MHP's major clients include Memorial Health, Inc., Gulfstream Corporation, Savannah College of Arts and Design (SCAD), three of Savannah's largest employers.

54.     Between December 2008 and August 2009, The Doctors Hospital of Tattnall assumed Tattnall Memorial Hospital's membership in the MHP network.

55.     Relator became Chief Executive Officer of Memorial Health, Inc. on June 1, 2009, and immediately thereafter, was informed by Mr. David Seal, Executive Director of MHP, that MHP and its clients had noticed a dramatic increase in charges for services provided by Defendants, The Doctors Hospital of Tattnall and Orthopedic Center, P.C.

56.     After reviewing claims documents submitted by Defendants, Relator directed, on or about July 2009, the immediate suspension of The Doctors Hospital of Tattnall from the MHP network and, on behalf of MHP, Memorial Health,

- 14 -

Gulfstream and SCAD demanded that all 2009 inflated claims be re-priced to pre-2009 prices.

57.     On or about August 2009, Relator, together with David Seal, Executive Director of MHP, Memorial's legal counsel, Mills Fleming, and representatives of Gulfstream and SCAD met with Defendants Michael Kleinpeter and Michael Scribner and their legal counsel to discuss the inflated claims and Relator's demand that the claims be adjusted to pre-2009 prices.

58.     Defendants Michael Kleinpeter and Michael Scribner admitted that upon purchasing The Doctors Hospital of Tattnall they inflated all inpatient and outpatient charges.  In response to Relator's inquiry as to the method used to support the inflated charges, Defendants responded that they simply chose an arbitrary inflation factor with no relationship to actual cost increases.

59.     On the basis of Defendants' responses and failure to provide an acceptable cost-related rationale for inflating The Doctors Hospital of Tattnall charges, Relator directed that MHP and its clients not pay 2009 claims and demanded a refund for claims paid before the inflated charges were discovered. Defendants refused to cooperate and, in fact, members of Defendant Orthopedic Center, P.C. unilaterally resigned from the MHP network.

60.     Negotiations to resolve the inflated paid and unpaid claims from The Doctors Hospital of Tattnall were finally concluded in November 2010 with an agreement to re-price all claims to pre-2009 levels.

61.     On information and belief, Defendants did not reduce their charges to any other payer, including the federal and state programs.

- 15 -

62.     On information and belief, in years 2009 and 2010, Defendants inflated the charges for services provided by The Doctors Hospital of Tattnall and Orthopedic Center, P.C. substantially in excess of any increase in the costs associated with patient care.  Such an increase has resulted in Defendants receiving excessive payments from Medicare and Medicaid and Medicare subscribers having to pay excessive coinsurance and deductibles for outpatient services.

63.     On information and belief, The Doctors Hospital of Tattnall generated approximately $77,944,980 in total inpatient and outpatient charges in 2009 (see 2009 CMS Cost Report filed in 2010) as compared to $29,603,336 generated in 2008 and $12,894,341 generated in 2007 for the same number of beds (under 25 beds).

64.     On information and belief, in 2009 The Doctors Hospital of Tattnall submitted to Medicare claims in the amount of $34,371,393 or 44% of 2009's total gross charges of $77,944,980.  According to Billian's Health Data Report, The Doctors Hospital of Tattnall was the country's 21st largest (out of 1300 CAHs) in Gross Medicare Patient Revenue in 2009.

65.     On information and belief, for the period July 2009 – June 2010, The Doctors Hospital of Tattnall had 161 cases of Major Hip, Knee, Ankle, Foot Surgery, Including Replacement (Adult) with no added health factors at an average charge per case of $125,911 as compared to the "All Georgia Hospitals" average charge per case of $44,995.  The average charge per day for the aforementioned cases was $48,427 at the Doctors Hospital of Tattnall as compared to the Georgia state-wide average charge per day of $13,635. (*see* ww.GAHospitalPriceCheck.com)

- 16 -

66.     On information and belief, for the period July 2009 – June 2010, The Doctors Hospital of Tattnall had 100 cases of Major Hip, Knee, Ankle, Foot Surgery, Including Replacement (Adult) with 1-minor added health factors at an average charge per case of $128,209 as compared to the "All Georgia Hospitals" average charge per case of $48,005.  The average charge per day for the aforementioned cases at the Doctors Hospital of Tattnall was $45,789 as compared to the Georgia state-wide average charge per day of $11,708. (see www.GAHospitalPriceCheck.com)

67.     On information and belief, in 2010 The Doctors Hospital of Tattnall generated approximately $90 million in inflated inpatient and outpatient charges of which $40 million related to Gross Medicare Patient Revenue.

68.     To Relator's knowledge Defendants are continuing to refer patients to The Doctors Hospital of Tattnall to take advantage of the inflated charges and excessive third-party reimbursement even if some patients should have been better cared for at more appropriate Savannah-area medical centers.

69.     In 2009 and 2010 a number of cases were brought to Relator's attention as President and CEO of Memorial Health University Medical Center ("Memorial") regarding referrals by physicians to Doctor's Hospital of Tattnall of Savannah area uninsured children and adults, children on Medicaid, adults on Medicare, instead of being cared for in the Orthopedic Surgery Center in Savannah or in Savannah hospitals.

70.     Several of these reports and complaints are within the files of Dr. Ramon Meguiar, Chief Medical Officer of Memorial.  There being no medical or

other legitimate reason for such referrals to geographically remote facilities, Relator deduced that the reason for such referrals was to generate increased patient volume at Doctor's Hospital of Tattnall which would then result in inflated reimbursement based on inflated cost reports prepared and filed by Defendant Doctor's Hospital of Tattnall. The inflated charges were far greater than the low or no reimbursement surgeries that would be performed at medical facilities in Savannah.

71.     By generating increased revenues as a result of their inflated cost conspiracy, the Defendants engaged in an effort to recruit community-based employed physicians from Memorial. The Defendants offered some Memorial employed primary care physicians the opportunity to invest in the imaging center associated with Doctor's Hospital of Tattnall and the other affiliated companies with the stated goal of increasing Southeastern Orthopedics' referral base.

72.     The Defendants also recruited physician practices within the Eisenhower Medical Associates group, the Chatham Medical group, and Memorial Medical Associates because some of those physicians were facing significant reductions in their salaries due to fair market value compliance adjustments underway at Memorial.

73.     To Relator's knowledge Defendants are continuing to refer patients to The Doctors Hospital of Tattnall to take advantage of the inflated charges and excessive third-party reimbursement while subjecting Medicare, Medicaid, TriCare and others to excessive deductible and coinsurance expenses.

74.    Defendants knew or should have known that they inflated the charges at The Doctors Hospital of Tattnall and Orthopedic Center, P.C. substantially in excess of any increase in the costs associated with patient care, which resulted in improper payments to The Doctors Hospital of Tattnall and members of the Orthopedic Center, P.C.

75.    To Relator's knowledge no action was taken by Defendants to reduce the inflated charges or to self-report their action to CMS and/or to the Office of Inspector General.

## COUNT I – FALSE CLAIMS ACT
### (False Claims)

76.    Plaintiff realleges each and every allegation above as if fully set forth herein.

77.    The inflation of charges at The Doctors Hospital of Tattnall and Orthopedic Center, P.C. substantially in excess of any increase in the costs associated with patient care resulted in the knowing submission of false claims by the Defendants for reimbursement under Medicare, Medicaid and TRICARE/CHAMPUS.

78.    The United States government, unaware of the falsity of the claims and in reliance on the accuracy and representations thereof, paid the inflated and thereby false claims.

79.    As a direct and proximate result of the Defendants' unlawful scheme, Medicare and Medicaid has been caused to pay monies to the Defendants which the Defendants would not otherwise be entitled to receive.

80.     The Defendants false claims violate the Civil False Claims Act, 31

U.S.C. § 3729, *et seq.* and have caused the United States to suffer many millions of

dollars of losses through the Medicare, Medicaid, and TRICARE/CHAMPUS

programs.

## COUNT II – FALSE CLAIMS ACT
(Conspiracy)

81.     Plaintiff realleges each and every allegation above as if fully set forth

herein.

82.     Through the act described above and otherwise, Defendants entered

into a conspiracy or conspiracies among themselves and with others to defraud the

United States and state Medicaid programs by submitting false and fraudulent

reimbursement claims for payment.

83.     Defendants have also conspired to omit disclosing or to actively conceal

facts which, if known, would have reduced government obligations to them or

resulted in repayments from them to government programs.

84.     Defendants have taken substantial steps in furtherance of those

conspiracies by preparing false cost reports and other records, by submitting such

records to the United States for payment or approval, and by directing their

agents, consultants and employees not to disclose such fraudulent practices.

85.     The United States government, unaware of the falsity of the claims

and in reliance on the accuracy and representations thereof, paid the inflated and

therefore false claims for reimbursement.

86.     As a direct and proximate result of the Defendants' unlawful scheme, Medicare and Medicaid and their subscribers have been caused to pay monies to the Defendants which the Defendants would not otherwise be entitled to receive.

87.     The Defendants false claims violate the Civil False Claims Act, 31 U.S.C. § 3729, *et seq.* and have caused the United States to suffer many millions of dollars of losses through the Medicare, Medicaid, and TRICARE/CHAMPUS programs.

## COUNT III – FEDERAL ANTI-KICKBACK STATUTE AND STARK ACT
### (Prohibited Referrals)

88.     Plaintiff realleges each and every allegation above as if fully set forth herein.

89.     On information and belief, Defendants Orthopedic Center, P.C., Orthopedic Surgery Center L.P., Michael Kleinpeter, John P. George, M.D., and Michael Scribner, knowing of the false claims conspiracy and inflated charges associated with care at Doctors Hospital of Tattnall, referred individuals after December 2008 to Defendant Doctors Hospital of Tattnall when there was no medical necessity or other legitimate reason to make such a referral.

90.     Prior to the purchase of Tattnall Memorial Hospital by Southeastern Orthopedic Center in December 2008 there were no such referrals.

91.     On information and belief, the purpose of such referrals was to comply with the conspiracy to generate and submit inflated and false claims to the United States and for the purpose of receiving remuneration for such referrals.

92.     Such referrals and such remuneration violate the Anti-Kickback

Statute (42 U.S.C. § 1320a-7b) and the Stark Act (42 U.S.C. § 1395nn) and

therefore constitute violations of the False Claims Act (31 U.S.C. § 3729, *et seq.*).

93.     The Defendants violations of the False Claims Act, the Anti-Kickback

Statute, and the Stark Act have caused the United States to suffer many millions

of dollars of losses through the Medicare, Medicaid, and TRICARE/CHAMPUS

programs.

## PRAYER FOR RELIEF

WHEREFORE, the Relator, on behalf of the United States of America and

himself, prays

1. That the Court enter judgment against Defendants in an amount equal to

three times the amount of damages the United States has sustained because of the

Defendants' unlawful actions in accordance with law under 31 U.S.C. § 3729 *et seq.*,

such amount expected to exceed $10,000,000 prior to trebling;

2. That the Court enter judgment against the Defendants in the form of a civil

penalty of $11,000 for each and every false claim that Defendants presented in

accordance with law under 31 U.S.C. § 3729, *et seq.*;

3. That the Court award pre- and post- judgment interest on the sums subject to

judgment in this case;

4. That Relator be awarded an amount that the Court deems reasonable for

collecting the civil penalty and damages on behalf of the United States, which shall

be at least 15 percent but not more than 25 percent of the proceeds of the action or

settlement of the claims if the United States intervenes, and not less than 25

percent nor more than 30 percent of the proceeds of the action or settlement of the

claim if the United States does not intervene;

5. That Relator be awarded all costs and expenses incurred, including attorneys'

fees;

6. That the Court order such other relief that is proper in the interests of justice.

Dated: June 2*t*, 2011.

Respectfully submitted,

Andrew L. Gorman
Georgia Bar No. 220508
BOWEN & GORMAN
535 East Congress Street
Savannah, Georgia 31401
Telephone: (912) 335-1909
Fax: (912) 344-4020

THALER LIEBELER, LLP
Lars H. Liebeler
1825 Eye Street, N.W.
Suite 400
Washington, D.C. 20006
Direct Telephone: (202) 587-4747
Main Telephone: (202) 466-4110
Fax: (202) 466-2693
Email: LLiebeler@TL-LawFirm.com
(*Pro Hac Vice* Motion Filed Herewith)

*Counsel for Relator, Phillip S. Schaengold*

- 23 -

## DEMAND FOR JURY TRIAL

Pursuant to the Seventh Amendment to the United States Constitution and Federal Rule of Civil Procedure 38(b), Plaintiff and Relator hereby demand trial by jury on all counts to which they are entitled under law.

_____
Andrew L. Gorman


Lars H. Liebeler
(*Pro Hac Vice* Motion Filed Herewith)